**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**MITUTOYO AMERICA CORPORATION,**

    **Plaintiff,**

**v.**                                                                           **Case No.  8:08-mc-36-T-TBM**

**SUNCOAST PRECISION, INC.,**

    **Defendant,**

**and**

**BANK OF AMERICA, N.A.,
MAJESTIC SOLUTIONS,
PATRICIA L. NESHTA, and
DAWN M. DELANEY,**

    **Supplemental Defendants.**
_____/

**O R D E R**

These are proceedings supplementary pursuant to Fed. R. Civ. P. 69(a) and § 56.29, Fla. Stat. (2005).  On December 27, 2007, Mitutoyo America Corporation (Mitutoyo America) obtained a default judgment against Suncoast Precision, Inc., (Suncoast) in the Northern District of Illinois in the total amount of $144,058.72.  On March 28, 2008, the final judgment was registered in the U.S. District Court for the Middle District of Florida.  (Doc. 1).  In December 2009, after certain garnishment efforts proved fruitless, Mitutoyo America moved to commence proceedings supplementary and to implead supplemental defendants.  (Doc. 14). On January 6, 2010, the court granted the motion and directed that Mitutoyo America file its complaint impleading Supplemental Defendants, Majestic Solutions, Inc., (Majestic), Patricia

L. Neshta, Dawn M. Delaney, and Bank of America, N.A., (BA). The complaint (Doc. 16) was superseded by Plaintiff's Amended Complaint Against Supplemental Defendants (Doc. 46) in February 2011. BA filed its answer and affirmative defenses (Doc. 48), as did Majestic, Ms. Neshta and Ms. Delaney (Doc. 49). Thereafter, discovery continued, motions for summary judgment were filed (Docs. 50, 54, 55), and the court proceeded to an evidentiary hearing on April 4, 2011.[1]

By its amended complaint, Mitutoyo America, as creditor, seeks to avoid certain allegedly fraudulent transfers made by Suncoast (the judgment debtor) to BA and to Majestic, Ms. Neshta, and Ms. Delaney. Plaintiff's claims are brought pursuant to Florida's Uniform Fraudulent Transfer Act, Fla. Stat. Ch. 726. More particularly, in Count One Mitutoyo America claims that certain transfers of Suncoast office machinery, an automobile, furniture, goodwill, and a loan credit are voidable pursuant to § 726.105 as against Majestic, Ms. Neshta, and Ms. Delaney. In Count Three, Mitutoyo America alleges that the certain payment of $57,124.23 paid to BA by Suncoast on or about July 2, 2007, is voidable as a fraudulent transfer pursuant to either §§ 726.105 or 726.106, Fla. Stat. In response, the Supplemental Defendants generally assert that Mitutoyo America cannot establish that the transfers were either actually or constructively fraudulent nor can it establish that such payments were made

---

[1] The court determined that the factual dispute prevented resolution of the summary judgment motions at least as to certain issues and took under advisement certain legal arguments presented by the Supplemental Defendants pending the evidentiary hearing. Given that the matter has now been tried and the court has otherwise resolved the issues herein, the Clerk shall terminate the motions for summary judgment (Docs. 50, 54, 55).

At the court's direction following the hearing, the parties submitted post-trial findings of fact and conclusions of law. *See* (Docs. 78-80).

by the debtor without receiving reasonable equivalent value for the transfer. Each Supplemental Defendant claims to have acted in good faith such that no finding of fraudulent transfer is appropriate in any instance. By Count Two, Mitutoyo America alleges that Majestic was formed shortly after the demise of Suncoast by Ms. Neshta and Ms. Delaney and that, as a successor corporation to Suncoast, Majestic is liable for such debts of Suncoast. Alternatively, Plaintiff alleges that Majestic formed a *de facto* merger with Suncoast, and as the surviving entity, Majestic is liable for such debts.

I.

Certain facts are undisputed. Plaintiff, Mitutoyo America, is the seller and distributor of precise measurement products manufactured by the Japanese company, Mitutoyo. Defendant, Suncoast Precision, Inc. (Suncoast or judgment debtor), was a Florida corporation that engaged in the sale and service of the types of measuring equipment manufactured by Mitutoyo. Mitutoyo America and Suncoast entered into a distribution agreement on or around March 15, 2006, whereby Suncoast became a Florida distributor of Mitutoyo's product line.[2] By June 30, 2007, Suncoast owed Mitutoyo America in excess of $143,000.00. A significant portion of that debt related to the sale of a Mitutoyo product by Suncoast to American Tool & Mold. Suncoast received a $39,625.00 deposit on that equipment in September 2006. The balance, $120,490.62, was received from American Tool & Mold and deposited into Suncoast's Wachovia Money Market account on June 15, 2007.[3]

---

[2]A copy of the Agreement was entered into evidence as Plaintiff's Exhibit 3A.

[3]*See* Plaintiff's Exhibits 8-12.

3

None of the money received was paid to Mitutoyo America as called for under the agreement. In August 2007, Mitutoyo America filed a civil action against Suncoast for goods sold and delivered to Suncoast or its customers, but for which Suncoast did not pay. A judgment was obtained in the United States District Court for the Northern District of Illinois on December 27, 2007, in favor of Mitutoyo America and against Suncoast in the amount of $144,058.72. The Judgment was registered with this court on March 28, 2008. (Doc. 1). That amount remains due and owing.

Testimony establishes that Robert Neshta was president and fifty percent owner of judgment debtor, Suncoast.[4] Suncoast was in the business of selling measuring equipment to third parties and servicing such equipment. Patricia Neshta (his wife) and Dawn Delaney (his daughter) were employees of Suncoast. Mr. Neshta claims the company effectively ceased business by the end of 2006, however, there is some evidence that it continued to operate in some fashion into 2007. On June 29, 2007, counsel for Suncoast notified Mitutoyo America in writing that it was liquidating and unable to pay its debt. Testimony reveals that the main telephone number for Suncoast, which is used for both sales and service customers, was still in the name of Suncoast on May 19, 2007, although evidence suggests that by that point, it was being answered by Majestic.

Robert Neshta had also been the president and fifty percent owner of Techtran Suncoast (Techtran) which was incorporated May 29, 1997.[5] That business was

---

[4] Other shareholders included Scott Kearney, Richard Chitos, and George Chitos.

[5] According to testimony from Ms. Delaney, Techtran sold and retrofitted a software package out of France for coordinate measuring machines.

administratively dissolved in September 7, 2006. It appears the business ceased doing business in 2005. A promissory note in the principal amount of $60,000.00 was executed by Robert Neshta, individually and as president of Techtran, to BA on July 1, 2003.[6] Evidence, although disputed, suggests that Suncoast's start-up and operating costs were funded by Techtran prior to Techtran closing. In July 2007, Suncoast paid off this promissory note with a check in the amount of $57,124.23 drawn on the Suncoast account at Wachovia Bank.[7] BA released its interest in the security on the Techtran loan in September 2007.[8] Although disputed by Plaintiff because of a lack of documentation, Mr. Neshta testified that Suncoast, through its board of directors, agreed to assume certain debts of Techtran, including the debt owed to BA and further, that the payment by Suncoast of the Techtran note to BA reduced an obligation due from Suncoast to Techtran. The payment was not because BA had extended additional credit to Suncoast.

 Majestic began its operations around April 1, 2007, occupying the same office location out of which Suncoast operated and using Suncoast telephone number. Patricia Neshta is the president and fifty percent shareholder of Majestic. Her daughter, Ms. Delaney holds the remaining fifty percent share and is vice president. Majestic sells hand tools and measuring equipment,[9] but its principal business is service and contract inspection. Robert

---

[6] *See* Plaintiff's Exhibit 15.

[7] *See* Plaintiff's Exhibit 13.

[8] *See* Plaintiff's Exhibit 16-17.

[9] The services that Majestic provides include consulting, calibration, programming, and reverse engineering, not wholly unlike those services provided by Suncoast. Evidence suggests that Majestic also buys, sells, and trades used equipment. Some of the equipment

Neshta is not an employee, shareholder or officer of Majestic, however, he does provide consulting services to Majestic and assists Ms. Delaney with her work.

By Ms. Delaney's account, essentially unrefuted, as Suncoast was closing down and she faced unemployment, she had some discussions with her father about starting a business focused on contract inspections. She and her mother thereafter started Majestic; they are certified with the State of Florida as a woman-owned minority enterprise. Ms. Delaney also approached her father and Dick Chitos about purchasing some of Suncoast's assets and agreed to assume some debt of Suncoast in exchange for office furniture and fixtures, a 1997 Nissan Pathfinder, the robotic arm/portable CMM, and machinery and equipment, including computers and a server.[10] In exchange for these assets, Majestic assumed over thirty thousand dollars in debt owed by Suncoast on the American Express and Wachovia lines of credit which Majestic pays on monthly.[11] Ms. Delaney conceded that Majestic "extremely overpaid" for the assets it received from Suncoast by assuming this amount of debt. However, by purchasing the assets in this fashion, Ms. Delaney did not have to come up with the cash to buy the assets. Ms. Delaney admits that she sought to continue the good relationships she had developed with Suncoast customers and she acknowledged that Majestic has done business

---

sold is of the same type Suncoast sold. But it is no longer a distributor.

[10]*See* Supplemental Defendants' Exhibit 17. Most of these items had been significantly depreciated by Suncoast prior to Majestic's purchase of them. According to Delaney, Majestic did not purchase any "goodwill" of Suncoast and the entry of the same on this exhibit was essentially an accounting fiction to balance the debits and credits.

[11]Records suggest that Majestic assumed debts of Suncoast and even Techtran. *See* Plaintiff's Exhibit 25.

with a number of them after its formation.[12] William Demers is the CPA for Majestic, just as he had been for Suncoast. The former principals of Suncoast (Robert Neshta, George and Dick Chitos, and Scott Kearney) had no ownership interest in Majestic.

By Ms. Delaney account as well, prior to its closing in 2005, Techtran funded the start up costs for Suncoast and such is reflected on Suncoast's books. Thus, she identified from a balance sheet for Suncoast from 2005 and 2006, that Suncoast owed Techtran $140,812.31 on a loan.[13] She testified that the figure represented the sum of accounts payable to Techtran which had accrued over several years. The same entry in 2006 shows a zero balance because of the decision to close Techtran. After Techtran ceased doing business, the liability was shown on Suncoast's accounts in entries under "Current Liabilities" which included an entry for the debt owed by Techtran to BA.[14] While it is troubling that such matters were not the subject of a writing nor evidenced by a promissory note, the testimony concerning the financial obligation to Techtran is not refuted.[15]

As for the debt to BA, as bookkeeper for Suncoast, Ms. Delaney signed the July 2, 2007, check to BA on direction of her father to pay off the line of credit that was assumed

---

[12] At trial, at least ten customers were specifically identified as being both Suncoast and Majestic's customers for whom Ms. Delaney had previously performed contract inspections. And clearly, she sought to do business with customers of Suncoast.

[13] *See* Supplemental Defendants' Exhibit 5.

[14] *See id.*

[15] Considerable effort by Plaintiff was made to discredit this testimony from the corporate tax records of Suncoast. That testimony, likely taken from the wrong witness, raised more questions than it provided answers and does not refute Delaney's testimony. The corporate tax returns for Majestic for 2007 - 2009 were also introduced. *See* Supplemental Defendants' Exhibits 23 and 24 and Plaintiff's Exhibit 32.

7

from Techtran. She claims that Suncoast had previously made payments to BA on this line of credit on behalf of Techtran. These payments were not for credit extended Suncoast but because it was a debt Suncoast had assumed and which was showing on Suncoast's books.

There is no evidence that Suncoast attempted to move or conceal its assets and Mitutoyo America was sent a letter advising that Suncoast was liquidating and unable to pay its debt.[16] There is no evidence that Suncoast was threatened with a lawsuit prior to any of the disputed transfers.

## II.

Proceedings supplementary are specifically authorized by Federal Rule of Civil Procedure 69, which provides in pertinent part that "[t]he procedure on execution– and in proceedings supplementary to and in aid of judgment or execution– must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a)(1). Under Florida law, proceedings supplementary are governed by § 56.29, Fla. Stat. (2005). In accordance with that statute, a court "may order any property of the judgment debtor, not exempt from execution, in the hands of any person or due to the judgment debtor to be applied toward the satisfaction of the judgment debt." §56.29(5), Fla. Stat. "When any gift, transfer, assignment or other conveyance of personal property has been made or contrived by defendant to delay, hinder or defraud creditors, the court shall order the gift, transfer, assignment or other conveyance to be void . . . ." § 56.29(6)(b), Fla. Stat.

---

[16] See Plaintiff's Exhibit 3d (also identified as Supplemental Defs. Ex. 1).

Pertinent to these proceedings, §§ 726.105 and 726.106, Fla. Stat., address fraudulent transfers to creditors. Section 726.105 provides, in part, as follows:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> 1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> 2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

§ 726.105(1). Section 726.105(2) identifies the "badges of fraud" which a court may consider in determining "actual intent" under paragraph (1)(a). In pertinent part, § 726.106 provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Fla. Stat. § 726.106(1).

### III.
### A.

Plaintiff contends that Majestic is a successor entity to Suncoast, and as such, that it is liable for the entire judgment of $144,058.72 held by Plaintiff against Suncoast. In general, "Florida law does not impose the liabilities of a predecessor corporation on a successor corporation unless: (1) the successor expressly or impliedly assumes obligations of the

predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor." *Lab. Corp. of Am. v. Prof'l Recovery Network*, 813 So. 2d 266, 269 (Fla. Dist. Ct. App. 2002) (citing *Bernard v. Kee Mfg. Co.,* 409 So. 2d 1047, 1049 (Fla. 1982)).  The basis for finding successor liability is founded upon the notion that "no corporation should be permitted to commit a tort or breach of contract and avoid liability through corporate transformation in form only." *Lab. Corp.*, 813 So. 2d at 269 (citing *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 154 (Fla. Dist. Ct. App. 1994)).

Here, evidence reveals that Majestic expressly assumed some, but not all, of Suncoast's debts.  There is no proof that the debt owed to Mitutoyo America by Suncoast was expressly or impliedly assumed by Majestic.  The debts were assumed in exchange for Suncoast assets, primarily office furniture, a 1997 Nissan Pathfinder, machinery, and equipment.[17]  Although the transfer of these assets in exchange for assumption of the Wachovia and American Express debts favored those creditors over Mitutoyo America, under Florida law, "it is not fraudulent to give the funds to some but not all existing creditors, even though the effect might be to injure or prejudice an existing creditor who was not chosen to receive the debtor's largesse.  These so-called preferential transfers are not deemed fraudulent even though their natural effect is to hinder or delay the non-preferred creditors." *Jacksonville Bulls Football, Ltd. v. Blatt*, 535 So. 2d 626, 629 (Fla. Dist. Ct. App. 1988) (citations

---

[17]Specifically, evidence establishes that Majestic assumed $7,661.00 in Suncoast debt owed on an American Express line of credit and $29,760.00 owed on a Wachovia line of credit.

omitted); *see also In re Leneve*, 341 B.R. 53, 61 (Bankr. S.D. Fla. 2006) ("repaying one creditor at the expense of others may not be nice but it does not automatically provide conclusive evidence of fraudulent intent). Thus, this factor does not provide a basis for holding Majestic liable for the Suncoast debt to Plaintiff.

Based on the evidence adduced at trial on the issue of whether a de facto merger occurred, this factor similarly provides Plaintiff no relief. "A de facto merger occurs where one corporation is absorbed by another, but without compliance with the statutory requirements for a merger." *Amjad Munim, M.D., P.A.*, 648 So. 2d at 153 (citing *Arnold Graphics Indus. v. Indep. Agent Ctr.*, 775 F.2d 38 (2d Cir. 1985); *Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834 (S.D.N.Y. 1977)). In order to constitute a de facto merger, "there must be some sort of continuation of the stockholders' ownership interests." *Bud Antle, Inc. v. E. Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985). Such did not occur in the instant matter. Rather, the testimony established that Suncoast's shareholders had no ownership interest in Majestic. Accordingly, I am obliged to conclude that there was no de facto merger of Suncoast and Majestic in these circumstances. *See also Bernard,* 394 So. 2d at 555 ("[T]he transaction could not be considered a de facto[] merger because Mr. Kee obtained no stock in Kee Manufacturing Company, Inc. for the sale of his assets.").

Plaintiff urges the applicability of the third factor, arguing that Majestic is a "mere continuation" of Suncoast's business, and therefore is liable for Suncoast's debt, i.e., the judgment owed to Plaintiff. Given the Neshta family's involvement in both Suncoast and Majestic, I find this a closer issue. Under Florida law, a successor corporation is responsible for its predecessor's debts where the successor corporation is a continuation of the prior

11

business but under a new name. *Lab. Corp.,* 813 So. 2d at 270. The "purchasing corporation must not merely be a 'new hat' for the seller, with the same or similar entity or ownership. While having common attributes does not automatically impose liability on a successor corporation, merely repainting the sign on the door and using new letterhead certainly gives the appearance that the new corporation is simply a continuation of the predecessor corporation." *Id.*

However, in considering whether a successor corporation is merely a continuation of its predecessor's business, Florida courts have held that a "key element of a continuation is a common identity of the officers, directors and stockholders in the selling and purchasing corporation." *Amjad Munim, M.D., P.A.*, 648 So. 2d at 154 (quoting *Bud Antle, Inc.,* 758 F.2d at 1458); *see also Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 630 (11th Cir. 1996) (applying Florida law) ("A 'mere continuation of business' will be found where one corporation is absorbed by another, as evidenced by an identity of assets, location, management, personnel, and stockholders."). The evidence here establishes that Suncoast and Majestic had different ownership and management groups, as well as a different business focus. While the evidence reveals that there was involvement by the Neshta family in both entities,[18] the critical element lacking here in order to make a finding of successor liability is

---

[18]The record is not well-developed as to the extent of day-to-day involvement of the Chitos brothers and Kearney, but it is clear that the three collectively owned fifty percent of Suncoast, with Robert Neshta owning the remaining fifty percent. There was testimony regarding meetings of the shareholders, and according to Ms. Delaney, Majestic was as successful as it was because she ran it, whereas the Chitos brothers and Robert Neshta had run Suncoast. It is undisputed that Robert Neshta, George Chitos, Richard Chitos, and Scott Kearney were not shareholders, directors, or officers of Majestic.

12

an overlap in officers, directors, or stockholders. It is undisputed that Ms. Delaney and Ms. Neshta were employees of Suncoast, and not managers, directors or shareholders. Similarly, Robert Neshta's role with Majestic is as a consultant, and not in an ownership or management position. The Eleventh Circuit's opinion in *Bud Antle* is instructive on this issue. In that case, "[t]he evidence was undisputed that there was no such continuation of management or ownership . . . . None of B &B's officers, directors, or stockholders ever became an officer, director, or stockholder of Eastern. Although some of B & B's officers may have been employed by Eastern, mere employment is insufficient to warrant application of the continuation exception." *Bud Antle*, 758 F.2d at 1458-59 (citations omitted).[19] Although certain factors weigh in Plaintiff's favor, including that Majestic operates from the same office location as Suncoast did; the companies have some of the same employees; the accounting system and accountant are the same for both; the telephone number is the same; the type of business is similar; and some of the customers are the same, by my consideration, the lack of continuity of ownership and management here ultimately proves fatal to Plaintiff's claim on the "mere continuation" theory.

      Plaintiff alternatively urges that the fourth factor applies– that certain transfers were a fraudulent effort to avoid the liabilities of Suncoast– such that Majestic may be held liable for the debts of its predecessor. The arguments urged by Plaintiff here are similar to those advanced by Plaintiff above. Thus, Plaintiff contends that the complicity of Supplemental

---

[19]Although *Bud Antle* is a Georgia case, it has been cited and applied by Florida courts. *See, e.g., Centimark Corp. v. A to Z Coatings & Sons, Inc.*, No. 6:05-cv-136-Orl-DAB, 2007 WL 4557247, at *5 (M.D. Fla. Dec. 21, 2007); *Lab. Corp. of Am.*, 813 So. 2d at 270; *Amjad Munim, M.D., P.A.,* 648 So. 2d at 154.

13

Defendants, Majestic, Ms. Delaney and Ms. Neshta, is evidenced by the trial testimony which established that Majestic operated virtually the same business; with substantially the same customers, with the same employees, from the same location, using the same telephone number, and the same accounting system, database, and accountant.  Plaintiff urges that the obvious fraud being perpetrated should give rise to successor liability.

On the factual findings set forth above, the evidence does not permit a finding of successor liability.  As noted above, Suncoast is not prohibited under Florida law from favoring one creditor over another.  *See  Jacksonville Bulls Football, Ltd.*, 535 So. 2d at 629.  Further, Ms. Delaney is not prohibited from using the business contacts she obtained through her work with Suncoast in developing her business for Majestic.  *See Thomas v. Alloy Fasteners, Inc.*, 664 So. 2d 59, 60 (Fla. Dist. Ct. App. 1995) (in the absence of a non-compete contract, former employee was free to contact old customers) (collecting cases).  And next discussed, the transfers made between Suncoast and Majestic did not violate Florida's Uniform Fraudulent Transfer Act.  Thus, it follows that the fourth factor of successor liability provides Plaintiff no relief.

B

Plaintiff next claims that the transfers of equipment, machinery, furniture, vehicle, and other physical assets of Suncoast to Majestic, Ms. Neshta and Ms. Delaney in exchange for Majestic's assumption of certain debts of Suncoast constituted fraudulent transfers in violation of the Uniform Fraudulent Transfer Act, chapter 726, Florida Statutes, (UFTA),[20]

---

[20]In 1988, Florida adopted the Uniform Fraudulent Transfer Act (UFTA), in chapter 726, Florida Statutes (1988), which continued prior statutory law as well as codified common

14

and must be set aside. Here, the claim is brought against the Majestic Supplemental Defendants pursuant to § 726.105. To establish a cause of action under § 726.105(1)(a), a transfer is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with the actual intent to hinder, delay, or defraud any creditor of the debtor. "Because it is difficult to establish a transferor's actual intent, courts generally consider the totality of the circumstances and determine whether any 'badges of fraud' are present in connection with a particular transfer." *In re Ramsurat*, 361 B.R. 246, 253 (Bankr. M.D. Fla. 2006). "The Eleventh Circuit has adopted the badges of fraud contained in the Florida fraudulent transfer statute." *In re McCarn's Allstate Finance*, 326 B.R. 843, 850 (Bankr. M.D. Fla. 2005) (citing *In re Levine*, 134 F.3d 1046, 1053 (11th Cir. 1998)).

The "badges of fraud" which a court may consider in determining actual intent under paragraph (1)(a), include whether: "(a) The transfer or obligation was to an insider; (b) The debtor retained possession or control of the property transferred after the transfer; (c) The transfer or obligation was disclosed or concealed; (d) Before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit; (e) The transfer was of substantially all of the debtor's assets; (f) The debtor absconded; (g) The debtor removed or concealed assets; (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the

---

law. *See* § 726.111, Fla. Stat.

obligation was incurred; (j) The transfer occurred shortly before or shortly after a substantial debt was incurred; (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." § 726.105(2). "While a single badge of fraud may create only a suspicious circumstance, several of them together may afford a basis to infer fraud." *In re PSI Indus., Inc.*, 306 B.R. 377, 387 (Bankr. S.D. Fla. 2003) (citing *In re World Vision Entm't, Inc.*, 275 B.R. 641 (Bankr. M.D. Fla. 2002)).

Suffice it to say that the parties derive differing conclusions from these badges of fraud. However, on the whole, I conclude that they fail to support the claim of fraud. True, Ms. Neshta and Ms. Delaney would be considered insiders, but neither appears to have played a role in the decision to shut down Suncoast and liquidate its assets.[21] The transfer of assets that did occur was not concealed and later Plaintiff was advised of Suncoast's liquidation. No one absconded nor is it shown that assets were concealed. Suncoast was unable to pay all its debts but at the time of this transfer, Suncoast had not been threatened with a lawsuit, nor had litigation commenced. Suncoast did not retain control of the assets transferred to Majestic,

---

[21]Under Florida law, an individual's "insider" status alone does not create personal liability. *Balsamo v. Gruppo Ceramiche Ricchetti, S.P.A.*, 862 So. 2d 812, 813 (Fla. Dist. Ct. App. 2003) ("Appellants' status as insiders, taken alone, does not expose them to liability absent proof that the transfer was made to them or that the corporate veil should otherwise be pierced."). Here, the transfer of furniture, equipment, machinery, and vehicle was to the company, Majestic, not Ms. Neshta or Ms. Delaney directly. And Plaintiff has failed to present sufficient evidence to otherwise support piercing of the corporate veil to hold the individual officers liable. *See AMC/Jeep of Vero Beach, Inc. v. Funston*, 403 So. 2d 602, 605 (Fla. Dist. Ct. App. 1981) ("In Florida, personal liability can only be imposed upon a corporate officer who has signed a contract in his personal capacity or who has used the corporate entity for fraudulent purposes or where the corporation was merely the alter ego of the shareholders."). It follows that Plaintiff's individual claims against Ms. Neshta and Ms. Delaney necessarily fail.

and as will be discussed further below, I conclude that the assets were transferred for a reasonable equivalent value. On the whole, the evidence simply does not demonstrate fraud under § 726.105(1)(a).

A finding that certain transfers are voidable under Florida Statute §§ 726.105(1)(b) and 726.106, turns on whether there is a finding of reasonably equivalent value in exchange for said transfers. A determination of whether a transfer of assets was for reasonable equivalent value must be made on a case by case basis. *See Walker v. Littleton*, 888 F. 2d 90, 93 (11th Cir. 1989). Section 726.105(1)(b) provides that a transfer is fraudulent as to present and future creditors "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (1) was engaged in or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Fla. Stat. § 726.105(1)(b). In essence, to prove a claim under Fla. Stat. § 726.105(1)(b), "the plaintiff must prove that the debtor[] did not receive 'reasonably equivalent value' in exchange for the transferred property." *In re Seaway Int'l Transp., Inc.*, 341 B.R. 333, 334 (Bankr. S.D. Fla. 2006). Although the statutes do not specifically define the term "reasonably equivalent value," courts considering the issue have generally considered many factors, including the "good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length." *Id.*

Similarly, § 726.106, Fla. Stat., provides in pertinent part that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a [present] creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." § 726.106(1), Fla. Stat. While it is Plaintiff's burden initially under both §§ 726.105(1)(b) and 726.106(1), Fla. Stat., to prove that Suncoast did not receive a reasonably equivalent value in exchange for the transfer with "the presumption being against the existence of fraud[,] . . .[w]here the parties involved in the alleged fraudulent transfer have a close relationship, such relationship tends to establish a prima facie case which must be met by evidence on the part of the defendant, and the transaction is regarded with suspicion." *Scott v. Dansby*, 334 So. 2d 331, 333 (Fla. Dist. Ct. App. 1976) (internal citations omitted).

By my consideration, the evidence reveals Suncoast received reasonably equivalent value in this transfer. Indeed, here it appears that the value paid (i.e, the amount of debt assumed by Majestic) exceeded the depreciated value of the assets transferred to Majestic. The evidence suggests the transfer was at arm's length and intended to benefit both parties. Majestic obtained operating equipment without having to raise cash to pay for it and Suncoast and its principals received needed debt relief. At the time, it appears Suncoast was winding down its affairs. Although the transfer and assumption of the Wachovia and American Express obligations favored these creditors over Mitutoyo America, such is not prohibited under Florida law. *See Jacksonville Bulls Football, LTD*, 535 So. 2d at 629. Thus, on this

18

record, it cannot be said that the transfers were made without the debtor receiving a reasonably equivalent value.

C.

Finally, as for the Suncoast transfer of $57,124.33 to BA, Plaintiff urges the same violates §§ 726.105(1)(b) and/or 726.106(1), Fla. Stat.[22] Here again, the dispute settles on whether reasonable equivalent value was given for the transfer. Again, I conclude on this record that it was. "Value is given for a transfer if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." § 726.104(1), Fla. Stat.; *see also In re Goldberg*, 229 B.R. 877, 884 (Bankr. S.D. Fla. 1998) (under Florida law, an insolvent debtor may make a valid conveyance to a creditor for the purpose of discharging a pre-existing or antecedent debt, but for such a conveyance to be valid the conveyance shall discharge the debt). Although disputed, the greater weight of the evidence reveals the payment by Suncoast was made on a debt owed to Techtran and that BA provided reasonably equivalent value to Suncoast by satisfying the Techtran promissory note and terminating its security interest on its property. *See U.S. v. Exec. Auto Haus, Inc.*, 234 F. Supp. 2d 1253 (M.D. Fla. 2002). Thus, by my review, sufficient evidence was presented to establish that Suncoast assumed to pay Techtran's debt to BA to reduce its own debt to Techtran amassed over a number of years of

---

[22]The evidence does not support a claim brought under § 726.105(1)(a). There is no evidence of actual fraud and a consideration of the badges of fraud supports Suncoast's position.

19

Techtran helping fund Suncoast's business. In short, I find no basis to void the transfer under either §§ 726.105(1)(b) and/or 726.106(1).

IV.

For the reasons stated above, Plaintiff's claims against the Supplemental Defendants, Majestic Solutions, Inc., Patricia L. Neshta , and Dawn M. Delaney, as well as Plaintiff's claims against Bank of America, fail. The Clerk is directed to enter judgment in favor of Supplemental Defendants, Majestic Solutions, Inc.; Patricia L. Neshta; Dawn M. Delaney; and Bank of America, N.A., with each party to bear its own fees and costs.

**Done and Ordered** in Tampa, Florida, this 18th day of July 2011.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record